J-S04015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2366 EDA 2023 |

Appeal from the Order Entered August 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000826-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2367 EDA 2023 |

Appeal from the Decree Entered August 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000749-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2368 EDA 2023 |

Appeal from the Order Entered August 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000543-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

|  | : |  |
|---|---|---|
|  | : |  |
|  | : |  |
| APPEAL OF: A.B., FATHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 2369 EDA 2023 |

Appeal from the Decree Entered August 17, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000134-2022

BEFORE:  BOWES, J., STABILE, J., and LANE, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 8, 2024**

A.B. ("Father") appeals from the decrees terminating his parental rights as to his children, M.J.B., born in August 2016, and M.L.B., born in October 2017.  Father has also appealed from the separate orders changing each child's permanency goal from reunification to adoption.  We affirm.

We glean the following from the certified record.  The family first became involved with the Philadelphia Department of Human Services ("DHS") on March 23, 2017, when M.J.B. was hospitalized at approximately seven months old for failure to thrive.  The child protective services report detailed that M.J.B.'s pediatrician had advised J.I. ("Mother") to supplement her breast milk, which was M.J.B.'s sole source of nourishment and was insufficient to provide M.J.B. the necessary nutrients.  However, Father threatened to leave Mother if she administered the supplements, insisting that M.J.B. be fed only by her breast milk and treated only by natural remedies.  In a similar vein, Mother and Father had elected not to immunize M.J.B.  The report also indicated a history of domestic violence and mental health diagnoses for

- 2 -

Mother, and chronicled the consequences of M.J.B.'s malnutrition, including that he had not gained weight in two months, was at 0.07 percentile for his age in weight, had been diagnosed with severe malnutrition, rickets, and iron deficiency anemia, suffering physical ailments as a result. When DHS opened its investigation, it learned that an older sibling, A.L., was staying with a family friend, L.J., but that L.J. was unwilling to serve as a placement resource for M.J.B.[1]

DHS successfully petitioned for dependency and placed M.J.B. in foster care, but he was returned to the care of Mother and Father in July 2017, while Mother was pregnant with his sibling, M.L.B. In October 2017, DHS received a report that Mother had tested positive for marijuana at the time of M.L.B.'s premature delivery at thirty-seven weeks. Following a stay in the Neonatal Intensive Care Unit, M.L.B. was discharged to the care of Mother and Father.

The family next came to the attention of DHS in January 2019. A.L., who was then seven years old, had been taken to the hospital for treatment after Mother crashed her car into a tree while A.L. was in the front passenger seat. A.L. was still in the primary care of L.J. but visited Mother on weekends. At the time, Mother was residing with a paramour, not Father. Through its investigation, DHS learned that Mother smoked marijuana in front of the children, had left M.J.B. and M.L.B. home alone at the time of the car accident, and would often drop off M.J.B. and M.L.B. with L.J. and fail to retrieve them

---

[1] A.L. is not otherwise involved in this appeal because an individual other than Father was named as her father.

at the agreed-upon time. Her behavior also frequently prompted the need for A.L. to take care of M.J.B. and M.L.B. during A.L.'s weekend visits. Based on the foregoing, DHS implemented a safety plan for M.J.B. and M.L.B.

In March 2019, Mother, M.J.B., and M.L.B. moved in with Father to a boarding home in Darby, Pennsylvania. The home was deemed unsuitable for the children, and on April 2, 2019, DHS obtained an order for protective custody and placed the children in foster care. However, the court lifted the order and discharged the dependency and commitment because it determined that it did not have jurisdiction, given that the family was residing in Darby. Accordingly, it ordered DHS to refer the children to the Delaware County Children and Youth Division ("CYD"). However, CYD did not accept the case, and additionally Mother ignored DHS's outreach while Father told DHS that he refused to accept M.J.B. and M.L.B. back into his care. Thus, on April 4, 2019, DHS for a third time obtained an order for protective custody and placed the children in foster care.[2]

The children were adjudicated dependent with a concurrent goal of return to parent and adoption. The Community Umbrella Agency ("CUA") outlined the following single case plan ("SCP") objectives for Father: "1) to ensure that the children's medical, dental and vision needs are met and keep all appointments; 2) to sign all releases of information; 3) to ensure the children are always supervised; and 4) to ensure that the children attend

---

[2] M.J.B. and M.L.B. have been in the care of the same pre-adoptive resource parent ("Foster Mother"), since August 2019 and August 2020, respectively.

school daily and complete all assignments." Trial Court Opinion, 11/30/23, at 11-12. By October 2019, Father had completed parenting classes, anger management counseling, and housing assistance. In November 2019, the case plan was revised for Father to also comply with visitation as set by the court and obtain suitable housing. In April 2020, DHS added four more SCP objectives for Father: 1) enroll in family school; 2) acquire appropriate housing with the assistance of community resources; 3) complete the necessary paperwork for a Philadelphia Health Maintenance Corporation grant; and 4) attend M.L.B.'s audiology appointment. In August 2021, after Father attended one of M.J.B.'s trauma therapy sessions yet denied M.J.B.'s trauma experiences and failed to understand his role in the trauma, the court referred Father for a mental health evaluation and ordered him to participate in the children's treatment as recommended by their therapist. Finally, Father was ordered to complete a parenting capacity evaluation and bonding assessment.

Turning to Father's compliance with his SCP objectives, he did not just fail to ensure that the children's medical needs were met, he actively attempted to thwart them. As noted by the trial court, both "children have major health issues and receive significant services. Both children have asthma, attend trauma-based therapy, and M.J.B. receives speech therapy" and has an allergy that requires the use of an EpiPen. *See* Trial Court Opinion, 11/30/23, at 22 (cleaned up). Father refused to acknowledge that the children have any medical issues requiring treatment, objected to the children

receiving therapy and refused to sign the appropriate releases, and even went so far as to attempt to prevent the usage of M.J.B.'s EpiPen in the event of a life-threatening exposure to his allergen.

In a similar spirit of defiance, Father refused to submit to the court-ordered mental health analysis, parenting capacity evaluation, or bonding assessment, and only participated in one family therapy session. Although Father had intermittently made progress towards unsupervised visits with M.J.B. and M.L.B., by August 2021, the trial court determined that supervised visits were necessary. Additionally, Father's attendance was inconsistent, with him only attending half of the scheduled visits between November 2021 and May 2022. The CUA caseworkers observed that the children acted out in negative ways in Father's presence and were sometimes entirely inconsolable until Foster Mother could intervene mid-visit to calm them. Once, the children cried so uncontrollably on the way to a visit with Father that the caseworker contemplated contacting the Children's Crisis Treatment Center ("CCTC"). Father neither obtained appropriate housing nor consistently provided proof of his employment to the CUA caseworkers. Finally, he was generally aggressive towards the CUA caseworkers and Foster Mother, and threatened the caseworkers that if his parental rights were terminated, he would come after them. As a result, a no-contact order was implemented against Father with respect to Foster Mother.

On November 18, 2021, Mother voluntarily relinquished her parental rights as to M.J.B. and M.L.B. On March 1, 2022, DHS filed petitions to

terminate Father's parental rights as to both children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) because he had not secured appropriate housing or demonstrated that he was financially capable of caring for the children, had not engaged in their emotional and therapeutic needs, and failed to consistently attend visits with the children. DHS also sought to change each child's goal from reunification to adoption.

The court held four days of hearings to address the goal change request and termination petitions.[3] DHS presented testimony from four CUA case managers, two trauma clinicians from CCTC, and Foster Mother. Children's legal counsel relayed to the court that both wished to be adopted by Foster Mother, that M.L.B. did not want to see Father again, and that M.J.B. only wanted to see Father again because Father would give him $100 at every visit. *See* N.T. Hearing, 8/10/23, at 129-33. Similarly, the GAL advocated for termination of Father's parental rights.

Father, meanwhile, testified that he had obtained housing and employment. Regarding the other objectives that he had not met, Father attested that he chose not to complete them because he contested their necessity, and the court could not force him to do things he did not want to do to be reunified with his children. Finally, Father envisioned reunification as meaning that Foster Mother would continue to provide the primary care for

---

[3] At the termination hearings, the children were represented by Barabra Berry, Esquire, as legal counsel, and Angelina Dagher, Esquire, as guardian *ad litem* ("GAL").

M.J.B. and M.L.B. while he would maintain his legal rights as their parent and be present at his choice without CUA involvement. During her testimony, Foster Mother unequivocally rejected this proposed arrangement.

The court summarized the evidence presented at the multiple hearings as follows:

> Father focused all his efforts and energy at being disruptive, obstreperous, and argumentative while incomprehensibly – and to his own detriment – refusing to attempt any of the SCP objectives with which he disagreed. Father prioritized being contrarian with CUA social workers, trauma therapists, and the court, over achieving reunification with his [c]hildren.

Trial Court Opinion, 11/30/23, at 20-21. Ultimately, the court changed each child's goal to adoption and granted the respective petitions to terminate involuntarily Father's parental rights pursuant to § 2511(a)(1), (2), (5), (8), and (b).

These timely appeals followed.[4] Both Father and the trial court complied with the requirements of Pa.R.A.P. 1925. Father presents the following issues for our consideration:

1. Whether the trial court erred by terminating the parental rights of Appellant, A.B., under 23 Pa.C.S. § 2511(a)(1)?

2. Whether the trial court erred by terminating the parental rights of Appellant, A.B., under 23 Pa.C.S. § 2511(a)(2)?

3. Whether the trial court erred by terminating the parental rights of Appellant, A.B., under 23 Pa.C.S. § 2511(a)(5)?

---

[4] This Court consolidated the matters *sua sponte*.

4. Whether the trial court erred by terminating the parental rights of Appellant, A.B., under 23 Pa.C.S. § 2511(a)(8)?

5. Whether the trial court erred by terminating the parental rights of Appellant, A.B., under 23 Pa.C.S. § 2511(b)?

6. Whether the trial court erred by determining it to be in the children's best interest to change the goal from reunification to adoption?

Father's brief at 5-6 (cleaned up).

We begin with Father's challenges to the termination decrees, which we review pursuant to our well-settled standard of review:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts

in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child, which we have described as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re Adoption of B.G.S.***, 245 A.3d 700, 705 (2021) (cleaned up). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). ***In re***

***Adoption of T.B.B.***, 835 A.2d at 395. Instantly, we consider § 2511(a)(2) and (b), which provide in pertinent part as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

The grounds for termination of parental rights under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct, but may also include acts of refusal and inability to perform parental duties. ***See In re S.C.***, 247 A.3d 1097, 1104 (Pa.Super. 2021). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***See***, ***e.g.***, ***In re Adoption of M.A.B.***, 166 A.3d 434, 443 (Pa.Super. 2017). At a termination hearing, the trial court may properly reject as untimely or disingenuous a parent's vow to

follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. ***See In re S.C.***, 247 A.3d at 1105.

Father argues that DHS did not sustain its burden as to § 2511(a)(2) because he is employed, "visits the children . . ., completed parenting and anger management and . . . located a place to live. He is willing to remedy the issues that brought the children into care." Father's brief at 22.

In finding sufficient grounds pursuant to § 2511(a)(2), the trial court noted that "Father's refusal to accept any responsibility for the reasons his [c]hildren came into care proved to be an insurmountable impediment to progress." Trial Court Opinion, 11/30/23, at 21. It detailed its reasoning as follows:

> Multiple witnesses, including Father, made it clear that he was not interested in or willing to do the work required to regain custody of the [c]hildren. [CUA caseworker Meghan] Flanagan testified that on more than one occasion Father told her that if he is reunified with the [c]hildren, he wants to arrange a scenario in which [Foster Mother] remains their caregiver, and he retains his parental rights. Ms. Flanagan stated that Father seemed more concerned about not losing his legal rights than for achieving reunification and raising the [c]hildren in his home.
>
> . . . .
>
> Father exhibited no signs of accountability during his testimony. He blamed others for his failures and was more concerned with engaging in skirmishes with people trying to help him than he was in trying to achieve reunification with the [c]hildren. Father's failure to accomplish many of his SCP objectives throughout the history of the case proved to the trial court that the conditions which brought the [c]hildren into care had not been remedied.

*Id*. at 31-33.

Our review of the certified record fully supports the trial court's conclusions. As detailed hereinabove, Father has not obtained housing and his insistence on eschewing professional medical advice regarding his children negatively impacted their health. Contrary to Father's assertion otherwise, it is abundantly clear to this Court that Father will not remedy this condition. Father's complete disregard for the many SCP objectives that he deemed unimportant, like the children's medical needs, trauma therapy, and his own mental health, demonstrate that the conditions that brought the children into care will not be remedied by Father. Accordingly, we discern no abuse of discretion on the trial court's part in finding statutory support for termination pursuant to § 2511(a)(2).

Turning to § 2511(b), we "consider the matter from the child's perspective, placing [his] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). This analysis "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular circumstances of each case dictate the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

- 13 -

The Pennsylvania Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should also consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Specifically, the trial court must render "a determination of whether the bond is necessary and beneficial to the child[.]" *In the Interest of K.T.*, 296 A.3d at 1113. This involves consideration of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *In re E.M.*, 620 A.2d at 484). The High Court has distinguished, however, "extreme emotional consequences" from a mere "adverse or detrimental impact" in the termination context. *Id*. at 1111. Specifically, the *K.T.* Court has cautioned that Pennsylvania courts "must not truncate [their] analysis and preclude severance based solely on evidence of an adverse or detrimental impact to the child." *Id*. at 1114 (cleaned up).

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine" the child's bond "with the **foster** parent." *Id*. at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental,

physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. Typically, a court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

On appeal, Father contends that DHS did not sustain its burden as to § 2511(b) because M.J.B. and M.L.B. "know [him] as their father[,]" he has attended visits with them, and "[i]t would not serve the developmental, physical and emotional needs of the children to terminate [F]ather's rights." Father's brief at 25.

In finding termination proper pursuant to § 2511(b), the trial court determined that the parent-child bond existed between Foster Mother and M.J.B. and M.L.B., but not with Father. *See* Trial Court Opinion, 11/30/23, at 33. Our review of the certified record confirms this conclusion. Foster Mother ensures the children's medical and psychological needs are met, bringing them to all required appointments and attending by phone the recommended caregiver sessions for each child's trauma therapy. She attends to their daily

needs and is the person to whom they both look for support. M.L.B.'s trauma therapist testified that M.L.B. is bonded to Foster Mother, whom she refers to as "mommy." *See* N.T. Hearing, 3/21/23, at 51-53. M.J.B. also refers to Foster Mother as "mom." N.T. Hearing, 11/2/22, at 31. Indeed, it was relayed that the interaction between Foster Mother and M.J.B. and M.L.B. resembled that of a mother and her children. *Id*.

Based on the foregoing, we conclude that the court did not err in determining that termination of Father's parental rights would not "cause extreme emotional consequences or significant, irreparable harm." *In the Interest of K.T.*, 296 A.3d at 1109-10 (cleaned up).

Having determined that the trial court properly found statutory grounds for termination pursuant to § 2511(a)(2) and (b), we affirm the decrees terminating Father's parental rights as to M.J.B. and M.L.B.

In his last issue on appeal, Father challenges the court's orders changing each child's permanency goal to adoption. Although Father is no longer aggrieved by the goal change orders now that we have affirmed the decrees terminating his parental rights, we address his challenges to those orders out of an abundance of caution. This Court "review[s] goal-change orders pursuant to an abuse-of-discretion standard of review. As such, we must accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law." *Int. of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020)

(cleaned up). Trial courts must apply the following procedure before changing a permanency goal:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act 42 Pa.C.S. §§ 6301–65, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over **all** other considerations, including the rights of the parents.
>
> Pursuant to 42 Pa.C.S. § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court[.]

**Int. of J.B.**, 296 A.3d 1234, 1238–39 (Pa.Super. 2023) (cleaned up, emphasis in original).

Here, the trial court determined that terminating Father's parental rights and changing the permanency goal to adoption was in the best interests for both M.J.B. and M.L.B. **See** N.T. Hearing, 8/17/23, at 4. Father argues that the court erred in changing each child's goal because he is employed, attended visits, completed his parenting and anger management courses, and took

- 17 -

steps to remedy the conditions that brought M.J.B. and M.L.B. into care. ***See*** Father's brief at 26.

Father's averments, at best, gloss over the realities of this case and contradict the trial court's fully-supported finding that Father made insufficient progress toward fixing the issues that led to placement. As detailed hereinabove, each child has been in foster care for well over fifteen months, Father failed to meaningfully comply with his SCP objectives, and DHS sustained its burden to terminate involuntarily Father's parental rights, rendering the goal of reunification impossible and adoption as the only reasonable goal. Moreover, it is apparent from the certified record that the "[s]afety, permanency, and well-being" of M.J.B. and M.L.B. would be served by adoption by Foster Mother. ***Int. of J.B.***, 296 A.3d at 1238 (cleaned up). Since this concern is the polestar of goal change inquiries, we discern no abuse of discretion in the trial court's decision to change the goals for M.J.B. and M.L.B., based upon their best interests, from reunification with Father to adoption by Foster Mother. ***See Int. of D.R.-W.***, 227 A.3d at 918 (concluding that changing the children's permanent placement goals to adoption was in their best interest where they shared no bond with their father, they shared a bond with their foster parents, and their father would not be capable of parenting them in the near future). Accordingly, we affirm the goal-change orders.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/8/2024